IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IMMERSION CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>MOTOROLA MOBILITY LLC and<br>MOTOROLA MOBILITY HOLDINGS<br>LLC,<br><br>    Defendants. | C.A. No. 17-cv-1081-RGA |

MEMORANDUM ORDER

Presently before the Court is the issue of claim construction of multiple terms in U.S. Patent Nos. 7,969,288 ("the '288 patent"), 9,323,332 ("the '332 patent"), 6,429,846 ("the '846 patent"), 7,982,720 ("the '720 patent"), and 8,031,181 (the '181 patent"). I have considered the parties' joint claim construction brief. (D.I. 67). I heard oral argument on September 12, 2018. (D.I. 73).

**I.  BACKGROUND**

On August 3, 2017, Plaintiff brought this action against Defendants alleging infringement of the '288, '332, '846, '720, and '181 patents. (D.I. 1 ¶ 2). Plaintiff asserts that Defendants licensed several of Plaintiff's patents until November 2015. At that point, Defendants allegedly declined to renew the license agreement and the existing license expired. The parties agree that a previous license agreement did exist and expire, and that the agreement identified all the patents at issue, except the '332 patent. (*Id.* ¶¶ 1–2; D.I. 9 ¶ 2).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [This is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13. "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings

2

based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19. Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation omitted).

## III. PATENTS AT ISSUE

Claim 18 of the '288 patent reads (as amended by the February 10, 2014 Ex Parte Reexamination Certificate):

> 18. A software method in a multi-tasking environment comprising:
>
>> storing a plurality of data sets in memory, each data set comprising a representation of one or more force effects, wherein each one of the plurality of data sets is associated with one software application;
>>
>> calling an *application programming interface*;
>>
>> determining which one of a plurality of concurrently running application programs *is active* in the multi-tasking environment; and
>>
>> generating a signal representing the data set associated with the *active application program*.

('288 patent, claim 18 (emphasis added)).

Claim 1 of the '332 patent reads:

> 1. A software method in a multi-tasking environment comprising:

>concurrently running a plurality of application programs, wherein each application program includes one or more data sets, each data set comprising a representation of one or more force effects;
>
>receiving from an *active application program* a force effect command;
>
>generating a signal representing the force effect command;
>
>and outputting a force effect based on the signal.

('332 patent, claim 1 (emphasis added)).

Claim 1 of the '846 patent reads (as corrected by the July 31, 2012 Certificate of Correction):

>1. A haptic feedback touch control for inputting signals to a portable computer and for outputting forces to a user of the touch control, the touch control comprising:
>
>>a *touch input device* integrated in a housing of said portable computer, said *touch input device* including an *approximately planar touch surface* operative to input a position signal to a processor of said computer based on a location on said touch surface which said user contacts, said position signal representing a location in two dimensions, wherein said computer positions a cursor in a graphical environment displayed on a display device based at least in part on said position signal; and
>>
>>at least one actuator coupled to said *touch input device*, said actuator outputting a force on said *touch input device* to provide a haptic sensation to said user contacting said touch surface, wherein said actuator outputs said force based on force information output by said processor, said actuator *outputting a force directly on said touch input device*.

('846 patent, claim 1 (emphasis added)).

Dependent claim 16 of the '846 patent reads (as corrected by the July 31, 2012 Certificate of Correction):

>16. A haptic feedback touch control as recited in claim 1 wherein said *touch input device* includes a plurality of different regions, wherein at least one of said regions provides said position signal and at least one other *region provides a signal that is used by said computer to control a different function*.

('846 patent, claim 16 (emphasis added)).

Claim 10 of the '720 patent reads (as amended by the February 18, 2014 Ex Parte Reexamination Certificate):

> 10. A haptic feedback device, comprising:
>
> a *touch screen* operative to output a first signal comprising coordinates of a contacted location on the *touch screen*, wherein the *touch screen* includes a first region associated with a cursor positioning, and at least one other non-overlapping control region not related to cursor positioning;
>
> a computer configured to receive the first signal;
>
> at least one actuator coupled to the *touch screen* and configured to impart a force to the *touch screen* to thereby provide a haptic effect in response to said contact, said force being based on a second signal output by the computer.

('720 patent, claim 10 (emphasis added)).

Claim 1 of the '181 patent reads:

> 1. A haptic feedback device, comprising:
>
> a *touch screen* operative to display a graphical image and to output a position signal associated with cursor positioning, wherein the *touch screen* comprises a first region associated with the cursor positioning and a second region configured to provide a second signal different from the first signal and associated with a control functionality different from cursor positioning, and wherein the first and second regions are associated with different haptic effects; and
>
> at least a first actuator configured to impart a first force to the *touch screen* to thereby provide a haptic effect in response to the cursor positioning or the control functionality different from cursor positioning, the first force based on information output by a computer device.

('181 patent, claim 1 (emphasis added)).

## IV. CONSTRUCTION OF AGREED-UPON TERMS

The Court adopts the following agreed-upon constructions.

| Claim Term | Construction |
| --- | --- |
| "one" | "one, and only one" |
| "software application" | "a computer program that is used for one or more specific user tasks" |

5

| Claim Term | Construction |
|---|---|
| "force effect" | "a single defined force or series of forces that may be commanded within the API" |
| "position signal representing a location" | "signal comprising coordinates of a location" |
| "haptic sensation" | "force sensation or tactile sensation" |
| "cursor" | "moveable visible mark used to indicate a position of interest on a display device" |
| "haptic effect" | "force effect or tactile effect" |
| "second region . . . associated with a control functionality different from cursor positioning" | "control area not related to cursor positioning" |
| "each application program includes one or more data sets" | No construction necessary.[1] |

## V. CONSTRUCTION OF DISPUTED TERMS

### 1. "is active"; "active application program"

a. *Plaintiff's Proposed Construction*: "has input focus"; "application program having input focus"

b. *Defendants' Proposed Construction*: "currently being used by the user"; "application program that the user is currently using"

c. *Court's Construction*: "receiving, or set to receive, input from the user"; "application program that is receiving, or set to receive, input from the user"

The parties agree that an active application does not require concurrent user input. (D.I. 73 at 13:1–4, 16:21–17:3, 19:24–20:5). The core dispute seems to be whether an active application is one that, in its current state, can only send output. To illustrate, drawing from the examples provided during oral argument, a user could be using one application to listen to music

---

[1] Although this term was disputed in the joint claim construction brief, the parties informed the Court during oral argument that they now agree no construction is necessary. (D.I. 73 at 40:23–41:5).

6

and another application for word processing, where the music application is running in the background. Defendants assert that both the music and the word processing applications are active because the user is "using both of those applications." (D.I. 73 at 18:1–4). In contrast, Plaintiff argues, although the music application is outputting music to the user, it is not active. Only the word processing application is active because, if the user were to type on the keyboard (*i.e.*, provide user input), the typed characters would appear in the word document without affecting the music application. (*See id.* at 20:12–21:18). Thus, as I understand it, Plaintiff's proposed construction focuses on whether the application is set to respond to user input.

The '288 patent specification supports Plaintiff's arguments. In describing a preferred embodiment, the specification states:

> The active window is typically the topmost displayed window in which input is provided by the user using the mouse-controlled cursor, a keyboard, or other peripheral. The other applications are "inactive" in that they are not receiving input from the user (although they may have a window displayed in the GUI [graphical user interface] which can be updated on the screen). The inactive applications may also receive input or send output.

('288 patent at 16:8–15). An "inactive" application may still send output, including displaying and updating a window. Therefore, contrary to Defendants' arguments, it is unlikely that sending output alone is sufficient to distinguish between active and inactive applications. Based on the specification's description of an inactive application, it follows that an application "receiving input from the user" is active. Notably, there is a distinction between "input" generally, which an inactive application may receive, and "input from the user," which an inactive application is not receiving.

I agree with Plaintiff's construction based on the meaning that Plaintiff attributes to "input focus." However, I think the phrase "input focus" invites confusion. First, "input focus" does not appear anywhere in the '288 patent. Plaintiff draws the term from a passage of the

7

specification that describes applications as being "in focus" or having "keyboard focus." ('288 patent at 16:3–8). Second, I am dubious that, without further explanation, "input focus" will assist a jury to better understand the claims. Third, "input focus" makes it difficult to distinguish between general "input" and "input from the user," as provided by the specification. (*See* '288 patent at 16:8–15; D.I. 73 at 24:8–14).

Plaintiff suggested at oral argument, "an active window is the one that is receiving or set to receive the user's inputs."[2] (D.I. 73 at 9:7–16, 11:10–15). I find "receiving or set to receive" user input a much clearer construction than "input focus." This phrasing is also consistent with the specification's description of an inactive application as "not receiving input from the user." Further, adding "set to receive" reflects the parties' shared understanding that concurrent user input is not required to make an application active. Therefore, I reject both parties' proposed constructions and construe active as "receiving, or set to receive, input from the user."

2. **"application programming interface"**

        a. *Plaintiff's Proposed Construction*: No construction is necessary. If construed, the term should be given its plain and ordinary meaning, within the context of the claim and consistent with the intrinsic evidence, which is a "set of clearly defined methods of communication between software components." Put another way, an "application programming interface" is an interface supplied by an operating system.

        b. *Defendants' Proposed Construction*: "a set of routines used by an application program to provide force feedback functionality." The "determining" and "generating" steps are performed by routines within the application programming interface.

        c. *Court's Construction*: No construction necessary.

The parties do not dispute that "application programming interface" ("API") is a term of art with a well understood meaning. (D.I. 73 at 31:1–17). However, Defendants argue that in

---

[2] I believe this would also apply to an "active application program."

8

the context of the claim, the term should be construed as limited to APIs providing force feedback functionality. Defendants assert that "the inventors acted as their own lexicographers to define the term 'force effect' in the '288 patent as being inextricably tied to the API they discussed in the specification." (D.I. 67 at 18). Defendants' theory is unpersuasive. The term "force effect" is defined as "a single defined force or series of forces that may be commanded within the API." ('288 Patent, D.I. 68, Ex. B at 18:20–22). The fact that a force effect "may be commanded within the API" does not mean that all APIs are limited to providing force effects.

Defendants also assert that "determining" and "generating" are performed by routines within the API. The language of the claim does not limit where either step is performed. Defendants rely on a passage in the prosecution history:

> [T]he problems of the prior art in 1997 were solved by the inventors of the '288 Patent. Aspects of their solutions (described in the '288 patent), include: storing data sets comprising representations of one or more force effects, creating an application programming interface (API) for configuring or requesting force effects, handling competing requests for force effects, determining which application is "active" (i.e. the application that the user is currently using), and generating a signal representing a data set for the active application so that proper force effects for the active application are generated.

(D.I. 68, Ex. FF at 4; D.I. 67 at 20). Defendants assert that the inventors' arguments require the claimed invention to include an API that does both the "determining" and "generating" steps.

Prosecution disclaimer does not apply "where the alleged disavowal of claim scope is ambiguous." Rather, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). Here, the prosecution history, like the claim, does

9

not expressly limit where the "determining" and "generating" steps occur. Thus, I do not think Defendants have shown an "unequivocal" surrender warranting their proposed construction.

Therefore, I reject Defendants' construction and find no construction necessary.

### 3. "touch input device"; "touch screen"

    a. *Plaintiff's Proposed Construction*: No construction is necessary. If construed, the term should be given its plain and ordinary meaning, within the context of the claim and consistent with the intrinsic evidence, which is a "device [or display device] that allows a user to provide input by touching an area on the device." A touch input device may include a touch surface, a touch sensor, a local microprocessor, and a display.

    b. *Defendants' Proposed Construction*: "device [or display device] that allows a user to provide input by touching an area on the device, and may include a touch surface, a display, and a touch sensor but not the bezel, chassis or controller"

    c. *Court's Construction*: "component that allows a user to provide input by touching an area on the device"

The parties agreed at oral argument that "touch input device" and "touch screen" are interchangeable. (D.I. 73 at 53:15–54:11). The only proposed difference between the terms is the use of "display device" for a touch screen and "device" for a touch input device. (D.I. 67 at 30, 84). The central dispute is whether features such as a bezel, chassis, or controller may be part of a touch screen/touch input device. (D.I. 73 at 41:17–23, 51:7-23).

Defendants' proposed construction is drawn from my prior claim construction analysis, which stated that I did not think the bezel and controller were components of the touch screen/touch input device. *Immersion Corp. v. HTC Corp.*, 2015 WL 581572, at *2–3 (D. Del. Feb. 11, 2015). The same analysis does not apply here. First, I did not include or exclude the bezel and controller from my prior claim construction, notwithstanding my discussion in connection with the claim construction. Second, I believe the opinion was meant to address issues related to a contemporaneous summary judgment ruling. *See Immersion Corp. v. HTC*

10

*Corp.*, 2015 WL 627425 (D. Del. Feb. 11, 2015). Thus, I consider anew the parties' arguments in the instant case.

Neither bezel nor chassis appear in the '846 patent. Regarding controller, both parties rely on the specification, which states, "In some embodiments, a separate, local microprocessor can be provided for the touchpad . . . ." ('846 patent at 6:24–37). Plaintiff argues that the specification shows the microprocessor (a controller) is part of the touch input device because it is "provided for the touchpad." (D.I. 67 at 32). Defendants argue that the touchpad itself is the touch input device, and thus the specification shows the controller is a separate component. (*Id.* at 36–37). I do not find the specification dispositive for either party.

Defendants also assert that Plaintiff disclaimed during the '720 patent reexamination any construction where a touch screen includes a controller. Defendants argue that Plaintiff distinguished its claims from the prior art by annotating a figure to show the touchscreen component of its claimed invention separated from the controller. (D.I. 67 at 37–39). I believe Plaintiff is correct that the annotation was meant to describe the prior art's teachings, not the claimed invention. Regardless, I find the reexamination history does not "unequivocally" disavow any construction of touch screen/touch input device that includes a controller. *See Omega*, 334 F.3d at 1324.

Therefore, I reject both parties' proposed constructions and construe touch screen/touch input device as "component that allows a user to provide input by touching an area on the device." Whether a particular feature is a part of the touch screen/touch input device in the accused products is a factual issue that should be addressed through expert testimony.

4. **"approximately planar touch surface"**

   a. *Plaintiff's Proposed Construction*: The term is definite and no construction is necessary. If construed, the term has the meaning that its constituent words impart to it, which is "substantially flat touch surface," "generally flat touch surface," or "flat or nearly flat touch surface," which are synonymous.

   b. *Defendants' Proposed Construction*: Indefinite.

   c. *Court's Construction*: No construction necessary.

Defendants argue that "approximately planar touch surface" is indefinite because a person of ordinary skill in the art cannot understand "how far from perfectly planar a touch screen can be before it is outside the scope of [the] phrase." (D.I. 67 at 51). Defendants rely on inapposite case law—*Interval Licensing v. AOL*, 766 F.3d 1364 (Fed. Cir. 2014), and *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005). In both, the Federal Circuit found a term indefinite because it was too subjective. *See Interval*, 766 F.3d at 1371–74 (finding "unobtrusive manner" indefinite and describing the phrase as "highly subjective, and on its face, provid[ing] little guidance to one of skill in the art"); *Datamize*, 417 F.3d at 1350 (finding "aesthetically pleasing" indefinite because "it is completely dependent on a person's subjective opinion"). Here, the parties do not dispute that "planar" has an objective meaning. The issue is whether the use of "approximately" makes the phrase indefinite.

Plaintiff points to numerous cases that have upheld similar terms of degree. *See, e.g., Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) (finding "substantially planar" sufficiently definite); *Edgewell Personal Care Brands, LLC v. Albaad Massuot Yitzhak, Td.*, 2017 WL 1900736, at *2, 4 (D. Del. May 9, 2017) (finding "generally tapered" sufficiently definite). Plaintiffs rely on *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, which held the term "at least about 160,000 IU/AU" to be indefinite. 927 F.2d 1200, 1217–18 (Fed. Cir. 1991). I

12

find *Amgen* distinguishable. The court in *Amgen* relied on evidence that "about" was used to recapture a range already found anticipated by the prior art. *See id.*

Defendant has failed to show by clear and convincing evidence "approximately planar touch surface" is indefinite. The parties agree that "planar" has a plain meaning of "flat." (D.I. 73 at 64:13–22). Thus, the term can be understood as an "approximately flat touch surface" and no construction is necessary. I do not, however, preclude Defendants from raising the indefiniteness argument in an appropriate motion for summary judgment.

### 5. "outputting a force directly on said touch input device"

 a. *Plaintiff's Proposed Construction*: No construction is necessary. If construed, the term should be given its plain and ordinary meaning, within the context of the claim and consistent with the intrinsic evidence, which is "outputting a force on the touch input device either through connected rigid bodies or without intervening structure."

 b. *Defendants' Proposed Construction*: "outputting a force on the touch input device without intervening structure"

 c. *Court's Construction*: "outputting a force on the touch input device without intervening structure"

The relevant claim describes at least one actuator "coupled to" the touch input device such that the actuator is "outputting a force directly on said touch input device." ('846 patent, claim 1). The parties dispute whether "outputting a force directly" allows the use of intervening structure between the actuator and the touch input device. (D.I. 67 at 64, 70–71).

Plaintiff argues that the claim only requires the actuator and touch input device to be "coupled," not "directly coupled," and thus the components may be connected by some intervening structure. (D.I. 73 at 66:22–67:2). The key distinction, Plaintiff asserts, is whether mechanical forces are applied directly through "connected rigid bodies," or indirectly through "compliant structures (*e.g.*, springs or foam) or transmission systems (*e.g.*, gearboxes or pulleys), which are designed to attenuate, amplify, or otherwise alter the forces (*e.g.*, convert speed and

13

torque)." (D.I. 67 at 65). In support, Plaintiff mostly relies on expert testimony (D.I. 73 at 65–67) and the specifications of other related patents (D.I. 67 at 68–70; D.I. 73 at 67:3–9, 68:2–17, 69:4–24).

Defendants assert that Plaintiff's construction is contrary to the intrinsic evidence. (D.I. 67 at 71–74). I agree. The '846 patent specification provides four embodiments (figures 4, 5, 6, and 8b) that depict the actuator(s) coupled to the touch input device. All four figures show the actuator(s) connected to the touch input device without intervening structure, rigid or otherwise.[3] ('846 patent at 8:23–27, 8:63–66, 10:4–31, 16:54–56). Thus, the four embodiments are consistent with Defendants' proposed construction. I do not think I am importing the embodiments into the claims. Rather, I think the embodiments illustrate what the inventors meant by the use of "directly."

I find the '846 patent specification more persuasive than Plaintiff's extrinsic evidence. Defendants' construction is consistent with the '846 patent specification. Therefore, I adopt Defendants' construction.

---

[3] The specification describes figures 4, 5, and 8b as having the actuator(s) "directly coupled," rather than just "coupled," with the touch input device. ('846 patent at 8:23–27, 8:63–66, 16:54–56). As I noted, Plaintiff argues that the claim's use of just "coupled," rather than "directly coupled," warrants a construction that allows intervening structure between the components. (*See* D.I. 73 at 66:22–67:2). However, given the lack of intervening structure in all four figures, the specification's use of just "coupled" to describe figure 6, and the claim's use of "directly" to modify "outputting a force," I find the intrinsic evidence does not support Plaintiff's argument.

14

6. **"region provides a signal that is used by said computer to control a different function"**

   a. *Plaintiff's Proposed Construction*: No construction is necessary. The phrase has the meaning that its constituent words impart to it.

   b. *Defendants' Proposed Construction*: "region provides a signal that is used by said computer to control a function not related to cursor positioning"[4]

   c. *Court's Construction*: No construction necessary.

The relevant claim describes a plurality of regions—at least one region that provides a "position signal" and at least one region that "provides a signal that is used by said computer[5] to control a different function." ('846 patent, claim 16). The dispute for claim construction is whether the latter region can provide a position signal in addition to a signal used to control a "different function." (D.I. 73 at 86:3–87:9).

As an initial matter, the claim only requires that the regions correspond to "different" functions. The plain meaning of "different" is satisfied when a first region provides only a position signal and a second region provides both a position signal and a signal for a second function.

Defendants argue that the specification limits the regions to signals for mutually exclusive functions. The relevant portion of the specification reads:

> "It should be noted that regions 62 [spring element] and 64 [actuator] need not be physical regions of the touchpad 16. That is, the entire touchpad 16 surface need merely provide coordinates of user contact to the processor of the computer and software on the computer can designate where different regions are located. The computer can interpret the coordinates and, *based on the location of the user contact, can interpret the touchpad input signal as a cursor control signal or a different type of signal*, such as rate control, button function, etc."

---

[4] Defendants amended their proposed instruction during oral argument. (D.I. 73 at 95:23–96:18).

[5] This claim depends from claim 1 of the '846 patent, which describes, among other things, "a portable computer." ('846 patent, claim 1).

(D.I. 67 at 83; '846 patent at 15:25–34, fig. 6 (emphasis added)). Defendants assert, the use of "or" in the last sentence indicates that each "location of the user contact" can correspond to either "a cursor control signal" (*i.e.*, position signal) or "a different type of signal," but not both. (D.I. 67 at 83). I disagree. The passage does not address whether each "location of the user contact" can be associated with multiple signals types or not. For example, per the specification's description, the computer might interpret a first input signal as a "cursor control signal." That does not, however, prevent the computer from interpreting a second input signal as "a different type of signal," even if both input signals arise from the same user location. Instead, the specification seems to mirror the claim language that requires the regions to correspond to "different," but not necessarily mutually exclusive, functions.

Therefore, I reject Defendants' construction and find no construction necessary.

The parties should submit a proposed order memorializing these constructions suitable for submission to the jury, within one week.[6]

IT IS SO ORDERED this 25 day of October 2018.

*Richard G. Andrews*
United States District Judge

---

[6] Plaintiff recently submitted a claim construction opinion from a related case pending before Judge Gilstrap in the Eastern District of Texas, *Immersion Corp. v. Samsung Electronics America Inc.* (No. 2:17-cv-572-JRG). (D.I. 75). Judge Gilstrap construed several of the same terms that are at issue here. I note that my constructions appear consistent with those in Judge Gilstrap's opinion.